METHOW FOREST WATCH, Kettle Range Conservation Group, The Lands Council, Wild Wilderness, and North Cascades Conservation Council, Plaintiffs,

v.

UNITED STATES FOREST SERVICE, Defendant,

Washington State Snowmobile Association and Winthrop Snowmobile Rental, Defendant–Intervenors.

No. 04–114–KI.

United States District Court, D. Oregon.

Jan. 20, 2005.

Gary K. Kahn, Peggy Hennessy, Reeves, Kahn & Hennessy, Portland, OR, for Plaintiffs.

Karin J. Immergut, United States Attorney, District of Oregon, Jeffrey K. Handy, Assistant United States Attorney, Portland, OR, Val J. McLam Black, Special Assistant United States Attorney, Office of General Counsel, United States Department of Agriculture, Portland, OR, Thomas L. Sansonetti, Assistant Attorney General, United States Department of Justice, Environment & Natural Resources Division, Jean E. Williams, Chief, Jimmy A. Rodriguez, Trial Attorney, U.S. Department of Justice, Wildlife and Marine Resources Section, Ben Franklin Station, Washington, DC, for Federal Defendant.

Beth S. Ginsberg, Laura J. Beveridge, Stoel Rives, LLP, Seattle, Washington, DC, for Intervenors.

## OPINION

KING, District Judge.

Before the court are the following motions: (1) motion for summary judgment by defendant U.S. Forest Service (# 43); (2) motion for summary judgment by defendant-intervenors Washington State Snowmobile Association and Winthrop Snowmobile Rental (# 42); and (3) motion for summary judgment by plaintiffs Methow Forest Watch, Kettle Range Conservation Group, the Lands Council, Wild Wilderness, and North Cascades Conservation Council (# 37). For the reasons below, I grant defendant and defendant-intervenors' motions for summary judgment and deny plaintiffs' motion for summary judgment.

## BACKGROUND

I. *Procedural History*

On January 23, 2004, plaintiffs brought a complaint under the National Environmen-

tal Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370F, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, and the Endangered Species Act, 16 U.S.C. §§ 1531–1544. The Forest Service filed a motion to dismiss plaintiffs' ESA claims on April 7, 2004; plaintiffs stipulated to a dismissal of those claims during the pendency of the action, and pursuant to a stipulated order, filed an amended complaint under NEPA and the APA on June 25, 2004.

## II. *Nature of the Case*

Plaintiffs seek declaratory and injunctive relief, challenging two decisions by the Forest Service to renew special use permits allowing snowmobiling and helicopter skiing on the Okanogan National Forest in northern Washington. Plaintiffs claim that the agency violated NEPA and its implementing regulations by issuing Environmental Assessments ("EAs") for these renewals that failed to analyze cumulative impacts. Plaintiffs seek to prohibit the agency from taking any actions pursuant to the challenged decisions until the agency complies with NEPA.

The Okanogan National Forest Land and Resource Management Plan, as amended, allows for special recreation uses, such as snowmobile and helicopter skiing, on the Okanogan National Forest if the uses will not damage or impair forest resources or programs. Accordingly, three snowmobile outfitter-guides, Chewack River Guest Ranch, Winthrop Snowmobile Rentals and Jack's RV, applied for the renewal of Special Use Permits ("SUPs") to conduct snowmobile rentals and guiding from snowparks in the forest. A local snowmobile club also requested public use of an existing warming hut in the Blackpine Basin. In response to the applications, the Forest Service prepared the *Snowmobile Outfitter/Guide Special Use Permit and Blackpine Basin Hut Environmental Assessment* ("Snowmobile EA").

The Snowmobile EA examines three alternatives. Alternative 1 is a "no action" alternative that would deny the applications for the SUPs and the use of the warming hut. Alternative 2 would authorize SUPs for up to 1,200 client days and the use of the warming hut, an increase from 500 client days. Finally, Alternative 3 would grant SUPs without increasing the client days. The Snowmobile EA evaluates impacts to wildlife, water quality and quantity, the spread of weeds, non-motorized recreation, private landowners, Roadless and Wilderness areas, Late Successional Reserves, soils, plants, and air quality. The Snowmobile EA also considers the existing levels and effects of winter recreation uses, such as private snowmobile usage, on forest resources. AR SM 1934–2054.

A helicopter-skiing outfitter-guide, North Cascades Heli–Skiing, Inc., separately applied for the renewal of its SUP for the transport and guiding of skiers. In response to this application, the Forest Service prepared the *Helicopter–Assisted Skiing Special Use Permit Environmental Assessment* ("Helicopter EA"). The Helicopter EA examines three alternatives. Alternative 1 is a "no action" alternative, which would deny the application. Alternative 2 would authorize an SUP for up to 1,050 client days, use of the Barron Yurt and Panther Basin Hut for overnight stays, use of a sno-cat during inclement weather, fuel caches, and use of a radio repeater on Goat Peak. Finally, Alternative 3 would grant an SUP for up to 550 client days, use of the Barron Yurt, use of a sno-cat during inclement weather, fuel caches, and a radio repeater. The Helicopter EA investigates impacts to fish species, roadless areas, Late–Successional Habitat, non-motorized recreation, Wilder-

ness, and wildlife, and examined the levels and effects of existing winter recreation uses, including snowmobiling, on forest resources. AR HS 2602–2676. It does not extensively evaluate the impacts of the SUP on vegetation, water quality, soils, or noxious weeds, finding instead that helicopter-assisted skiing does not affect these resources. AR HS 2654.

The Forest Service prepared Biological Assessments ("BAs") pursuant to the Endangered Species Act ("ESA") for each SUP. AR SM 1388; AR HS 2236. On July 29, 2001, the Forest Service submitted the BAs to the United States Fish and Wildlife Service ("FWS") for "consultation" under section 7 of the ESA. The FWS had to determine whether each project was or was not likely to adversely affect ESA-listed species. With respect to both decisions, the FWS concluded that the decisions were not likely to adversely affect any listed threatened or endangered species. AR SM 1469; AR HS 2300. However, the FWS also made the following recommendation:

> A large-scale (e.g., Province, Ranger, District, or watershed) coordinated recreation management strategy and action plan should be developed to assess the resources' compatibility with the number and type of existing winter recreation activities in the Upper Methow prior to increasing the use levels. In the absence of such an analysis, the FWS is concerned that the cumulative effects of on-going and proposed activities on listed species may not be adequately addressed.

AR SM 1471; AR HS 2302.

On July 17, 2002, the Tonasket District Ranger and the Methow Valley District Ranger signed a Decision Notice and Finding of No Significant Impact ("DN/FONSI") for the issuance of three five-year SUPs for snowmobile outfitting and guiding from several snowparks within the Ranger Districts, adopting Alternative 2 identified in the Snowmobile EA. This decision includes the use of the Blackpine Basin Hut. AR SM 2115.

On July 31, 2002, the Methow Valley District Ranger signed a DN/FONSI for the issuance of an SUP for helicopter and sno-cat transport and guiding of nordic and alpine skiers on designated routes and landing sites in the Ranger District, adopting Alternative 2 evaluated in the Helicopter EA. This decision includes the use of the Barron Yurt, an electronic repeater site, and remote fuel caches. The issuance of FONSIs for the snowmobile and helicopter proposals means that the Forest Service determined an Environmental Impact Statement ("EIS") was not necessary for either. AR HS 2941.

After the Forest Service issued the DN/FONSIs for the snowmobile and helicopter permit applications, plaintiffs, except Lands Council, administratively appealed the decisions. AR SM 2154; HS 2974. The Deputy Regional Forester denied plaintiffs' appeal and affirmed the FONSIs in October 2002. AR SM 2214; HS 3114. Plaintiffs challenge the two EAs/FONSIs.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On a motion for summary judgment, the evidence is viewed in the

light most favorable to the nonmoving party. *Robi v. Reed,* 173 F.3d 736, 739 (9th Cir.), *cert. denied,* 528 U.S. 952, 120 S.Ct. 375, 145 L.Ed.2d 293 (1999).

## DISCUSSION

### I. *Preliminary Issues*

#### A. *Standing*

The Forest Service challenges the plaintiffs' standing to bring this action. In response to the Forest Service's argument, plaintiffs submit several affidavits and declarations from their members, each of whom claim recreational interests and interests in the protection of wildlife in the areas at issue.

To satisfy standing requirements under Article III of the United States Constitution, a plaintiff must show:

(1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Friends of the Earth v. Laidlaw Envtl. Services,* 528 U.S. 167, 180, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), *("Laidlaw").* Environmental organizations have standing if their individual members would have standing. *Id.* at 181, 120 S.Ct. 693.

The Forest Service focuses on whether the plaintiffs have shown an actual or imminent injury in fact, as required under *Laidlaw,* and claims that the declarations merely show general concerns, not a likelihood of a particularized injury.

▉▉▉ I do not believe the test for standing is quite as rigorous as the Forest Service argues. Plaintiffs adequately allege injury in fact when they "aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Id.,* quoting *Sierra Club v. Morton,* 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Plaintiffs do not have to present trial-like evidence of actual harm. Rather, an "increased risk" to the environment is all that is needed to establish the injury prong for standing in these environmental procedural claims. *Ecological Rights Found. v. Pacific Lumber, Co.,* 230 F.3d 1141, 1151 (9th Cir.2000). The members' recreational activities and interests adequately documented in their affidavits and declarations are sufficient to meet the Article III standing requirements.

#### B. *Exhaustion of Administrative Remedies*

▉▉▉ Exhaustion of administrative remedies is a jurisdictional prerequisite to the maintenance of this action. *Oregon Natural Resources Council Fund v. Forsgren,* 252 F.Supp.2d 1088, 1096 (D.Or.2003). Although the Executive Director of the Lands Council claims in his affidavit in support of standing that his organization was a party in the administrative proceeding, the Administrative Record does not support this claim. Therefore, Lands Council must be dismissed as a plaintiff for failure to exhaust administrative remedies.

### II. *National Environmental Policy Act ("NEPA")*

#### A. *Standard of Review for Evaluating Claims Under NEPA*

The purpose of NEPA is to foster better decision making and informed public par-

ticipation for actions that affect the environment. 42 U.S.C. § 4321; 40 C.F.R. § 1501.1(d). NEPA requires federal agencies to involve the public, consider alternatives, and disclose the impacts of a proposed action and alternatives to it before making a decision. 42 U.S.C. § 4332(2)(C). NEPA does not guarantee substantive results but only sets forth procedural mechanisms to ensure proper consideration of environmental concerns. *City of Carmel–By–The–Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1150 (9th Cir. 1997).

NEPA mandates that an Environmental Impact Statement ("EIS") be prepared for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). As a preliminary step, the agency may prepare an EA to determine whether the environmental impact of the proposed action is significant enough to warrant an EIS. *See* 40 C.F.R. § 1501.4(c); 1508.9(a)(1).[1] In concluding that a proposed action will not have a significant effect on the human environment, an agency may rely on mitigation measures that reduce the magnitude of the effects below the level of significance. *City of Auburn v. U.S. Gov't.*, 154 F.3d 1025, 1033 (9th Cir.1998).

The standard of review of agency documents prepared pursuant to NEPA is the "arbitrary and capricious" standard specified by the APA. The APA authorizes a court to "hold unlawful or set aside agency actions, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In determining whether a Forest Service decision is arbitrary and capricious, courts "consider whether the decision was based on a consideration of the relevant factors

and whether there has been a clear error of judgment." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

■ In the NEPA context, including the situation in which the Forest Service has decided not to prepare an EIS, the arbitrary and capricious standard requires a court to ensure that an agency has taken a "hard look" at the environmental consequences of its proposed action. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir.1998). Under this standard, a court must defer to an agency's decision that is "fully informed and well-considered." *Id.* (quoting *Save the Yaak Committee v. Block*, 840 F.2d 714, 717 (9th Cir.1988)). Within this narrow review, a court cannot substitute its judgment for that of the Forest Service, but instead must uphold the agency's decisions so long as the agency has "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 953–54 (9th Cir.2003). Finally, "an agency's decision not to prepare an EIS will be considered unreasonable if the agency fails to supply a convincing statement of reasons why potential effects are insignificant." *Blue Mountains Biodiversity*, 161 F.3d at 1211 (quoting *Save the Yaak*, 840 F.2d at 717).

### B. *Scope of the Environmental Review*

■ Plaintiffs allege that the environmental effects of the two actions must be considered in a single NEPA document, which must be an EIS. An agency's determination of the proper scope of NEPA review is entitled to considerable deference. *Earth Island Inst. v. U.S. Forest*

---

1. We rely on NEPA regulations, promulgated by the Council on Environmental Quality ("CEQ"), to guide our review of an agency's

compliance with NEPA. *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 894 n. 1 (9th Cir.2002).

*Service,* 351 F.3d 1291, 1305 (9th Cir.2003). A single environmental review document is required for distinct projects when there is a single proposal governing the projects, *Kleppe v. Sierra Club,* 427 U.S. 390, 399, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), or when the projects are "connected," "cumulative," or "similar" actions under the regulations implementing NEPA. *See* 40 C.F.R. § 1508.25.

■ Plaintiffs appear to argue that there will be cumulatively significant impacts on various resources, and therefore the actions fall under the category of "cumulative" actions in 40 C.F.R. § 1508.25.[2] However, the Forest Service analyzed the actions collectively in each EA, providing a comprehensive evaluation of the cumulative impacts of the proposed and existing winter recreation activities and, as discussed below, neither the EAs nor the record as a whole raise questions as to whether those impacts are significant. *Earth Island Inst.,* 351 F.3d at 1305; *Native Ecosystems Council v. Dombeck,* 304 F.3d 886, 894 (9th Cir.2002) ("[n]othing in the record suggests that the Forest Service's goal was to segment review of the road density amendments so as to minimize their seeming cumulative impact."). Therefore, I cannot say that the Forest Service acted arbitrarily in deciding not to evaluate the impacts of each project in a single document.

### C. *Cumulative Impacts*

■ Even if a single, comprehensive environmental document is not required, the agency must adequately analyze the cumulative effects of multiple projects within each individual EA to determine whether a proposed action will have a significant impact on the environment.

*Neighbors of Cuddy Mountain v. U.S. Forest Service,* 137 F.3d 1372, 1378 (9th Cir.1998). A "cumulative impact" is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. Cumulative impacts must be assessed in sufficient detail to be "useful to a decisionmaker in deciding whether, or how, to alter the program to lessen cumulative impacts." *City of Carmel–By–The–Sea,* 123 F.3d at 1160. However, the "determination of the extent and effect of [cumulative impact] factors, and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies." *Kleppe,* 427 U.S. at 414, 96 S.Ct. 2718.

■ Plaintiffs challenge the Snowmobile and Helicopter EAs for failing to consider cumulative impacts. They make two different arguments. First, they contend that in both EAs, the Forest Service failed to consider the cumulative effects of these projects in combination with present and past winter recreational uses in the area. Plaintiffs describe the numerous decisions made by the agency respecting winter recreation in the area since 1982 in support of this argument. Second, they argue that in each EA at issue, the Forest Service failed to consider the combined impact from both decisions. Plaintiffs also rely on the FWS's comments, as quoted above, that the FWS is concerned that the cumulative effects on listed species of on-going and proposed activities may not be adequately addressed in the absence of a coordinated management strategy.

---

**2.** Cumulative actions are those "which when viewed with other proposed actions have cumulatively significant impacts." Because cumulative actions by definition have significant impacts, they must be considered in a single EIS. 42 U.S.C. 4332(2)(C); 40 C.F.R. 1508.25(a)(2).

Plaintiffs rely heavily on a Ninth Circuit case, *High Sierra Hikers Ass'n v. Blackwell*, 381 F.3d 886 (9th Cir.2004) and a D.C. Circuit case, *Grand Canyon Trust v. Federal Aviation Administration (FAA)*, 290 F.3d 339 (D.C.Cir.2002), to describe what NEPA requires.

In *High Sierra*, the Forest Service issued and renewed a number of special-use permits to commercial packstock operators without evaluating the cumulative impacts of those uses, in violation of NEPA. The Ninth Circuit found that the Forest Service failed to take the "requisite 'hard look'" at the environmental consequences of its proposed action" and that the cumulative impacts of the numerous permits would likely require the completion of an EIS. *High Sierra*, 381 F.3d at 896.

In *Grand Canyon Trust*, the FAA issued an EA and FONSI for an airport near Zion National Park in Utah. In the EA, the FAA only addressed the incremental impact resulting from the replacement airport rather than the cumulative impact on the natural quiet of the park, and its statement on cumulative effects was, in full: "There are no known factors that could result in cumulative impacts as a result of the proposed St. George Replacement Airport." *Grand Canyon Trust*, 290 F.3d at 341. The D.C. Circuit held that the FAA's decision was arbitrary and capricious because NEPA regulations require an analysis of all impacts, not just incremental impacts. *Id.* at 346.

However, as discussed below, in contrast to the decisions at issue in *High Sierra* and *Grand Canyon Trust*, after careful review of the record, the Forest Service adequately evaluated the cumulative effects of each proposed action, alone and together. For ease of reference, I will separately address plaintiffs' arguments with respect to each review criteria.

1. *Adjacent Landowners*

Plaintiffs argue that the Snowmobile EA fails to evaluate the noise on adjacent landowners from the existing 10,000 snowmobiles and instead focuses on the effects of the incremental increase in snowmobile use. However, the Forest Service provides a description of each snowpark where outfitter-guide permittees are allowed to guide, the approximate number of snowmobiles at each snowpark on an average weekend and week day, the approximate distance the snowmobiles travel away from the snowpark and private land before they can no longer be heard from the private land, and how the vegetation and topography surrounding each snowpark influences sound levels. The Forest Service acknowledges that existing winter recreation use, and the reasonably foreseeable 8% increase in snowmobile use in the future, plus the adoption of either Alternatives 1, 2 or 3, will disturb people living near snowparks. SM EA 29. Nevertheless, the Snowmobile EA states that the proposed minimal seven percent increase in snowmobile use posed by the adoption of Alternative 2 would not produce enough noise to rise to the level of a significant impact on adjacent landowners, even given existing noise levels. SM EA 26. The Forest Service adequately examined the cumulative effects of winter recreation on adjacent landowners.

 Plaintiffs argue that the Helicopter EA contains no analysis of the effects on adjacent lands. However, this concern was never raised in the public commenting process. Plaintiffs do not respond to the assertion in the Forest Service's response brief that plaintiffs have waived the right to raise this issue since by failing to alert the agency during the commenting or appeal period plaintiffs did not allow the agency to give meaningful consideration to their concern. *Dept. of Transportation v.*

*Public Citizen,* 541 U.S. 752, 124 S.Ct. 2204, 2213, 159 L.Ed.2d 60 (2004). While there is no statutory or regulatory requirement for issue exhaustion here, *Sims v. Apfel,* 530 U.S. 103, 108, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000), courts have required issue exhaustion during the public comment period, unless some equitable exception applies. *See, e.g., Holy Cross Wilderness Fund v. Madigan,* 960 F.2d 1515, 1528 n. 18 (10th Cir.1992); *Morris v. Myers,* 845 F.Supp. 750, 755 (D.Or.1993) (and cases cited therein). The court will not consider this issue.

### 2. *Air and Water Quality*

Plaintiffs next challenge the analyses provided for impacts to air and water quality in both EAs. The Forest Service cites in the Snowmobile EA to the Yellowstone and Grand Teton National Park Environmental Impact Statement ("Yellowstone EIS") and prior studies—a 1995 air quality study in the Upper Methow Valley and a 1999 report on water quality concerns related to snowmobile usage—in its evaluation of impacts on air and water quality. Plaintiffs dispute the Forest Service's reliance on these reports to support its determination that cumulative impacts of winter recreation use will not be significant.

The Forest Service is not required to conduct multiple scientific studies within the analysis area, particularly where, as here, the Forest Service discloses the source of its information and identifies the factors that differentiate the study's analysis area from the EA's analysis area. *Inland Empire Public Lands Council v. Schultz,* 992 F.2d 977, 981 (9th Cir.1993) (court will "defer to an agency's expertise on questions of methodology unless the agency has completely failed to address some factor, consideration of which was essential to a truly informed decision whether or not to prepare an EIS.").

The 1995 air quality study in the Snowmobile EA informs the Forest Service's summary of past and existing sources of air pollution in the Methow Valley, and the agency uses the Yellowstone EIS to predict the impact on air quality of continued and increased snowmobile use. The Snowmobile EA identifies the number of snowmobiles in the most heavily traveled areas in the EA's analysis area, and uses the Yellowstone EIS as a means of comparison to determine whether snowmobile use significantly affects air quality. The Forest Service discloses that background levels of pollutants may be higher in Okanogan County than in Yellowstone, and that temperature inversions may cause pollutants to be trapped in the analysis area. AR SM 1966. Even given these differences, snowmobile staging areas in Yellowstone had four to 26 times the number of machines found at the most congested snopark in the EA's analysis area, colder temperatures in Yellowstone can result in higher carbon monoxide ("CO") concentrations there, and the snowmobile use in the EA analysis area is more dispersed than in Yellowstone. *Id.* Using the Yellowstone EIS as a means of comparison, the Forest Service finds that, considering background levels from existing sources and the proposed increase in snowmobile use, emissions would be well within the CO and particulate standards. AR SM 1967. The Forest Service took the requisite "hard look" at impacts on air quality.

Similarly, the Forest Service discloses impacts to water quality in the Snowmobile EA, relying in part on the Yellowstone EIS where snowmobile use is eight times greater than in portions of the EA's analysis area. *See, e.g.,* AR SM 1968 (snowmobiles "could ... degrade water quality by depositing pollutants on the snow"); AR SM 1969 ("water quality degradation has been documented in association with 2–stroke motor usage"); AR SM 1969 ("ammonium, sulfate, benzene, and toluene" are

"positively correlated with over-snow traffic"); AR SM 1969 ("elevated emission levels in snow . . . generally are dispersed into surrounding watershed at concentrations below levels likely to threaten human or ecosystem health"); AR SM 1970 ("no measurable changes in water quality or effects on aquatic resources in Yellowstone National Park, even given . . . eight times greater" snowmobile use).

Plaintiffs complain that the Forest Service did not evaluate the effect of methyl tertiary butyl ether ("MTBE") and polycyclic aromatic hydrocarbons ("PAHs"). The Snowmobile EA states that MTBE is not a fuel additive in Washington, Idaho, or Oregon, and most snowmobilers purchase fuel at local gas stations. AR SM 1969. Similarly, while the Snowmobile EA could better call out its reliance on the Yellowstone EIS for its evaluation of the effect of PAHs on the environment, according to the Snowmobile EA, the Yellowstone EIS found "no evidence of measurable changes in water quality or effects on aquatic resources." AR SM 1971. In both cases, the Forest Service explicitly acknowledges that there are no specific studies analyzing the impacts of snowmobile use on water quality in the analysis area, and explains the limitations of relying on the studies it does have. AR SM 1969. Based on its review of the best available existing information, the Forest Service took the requisite "hard look" at impacts to water quality. 40 C.F.R. § 1502.22 (agency must make clear information is lacking and provide summary of existing scientific information).

Plaintiffs fault the Forest Service for failing to evaluate impacts on air and water quality from helicopter-assisted skiing in either EA, particularly with respect to use of sno-cats and fuel caches. The Helicopter EA states it need not evaluate the cumulative effects of helicopter use and snowmobile use on air quality because helicopter-assisted skiing is not expected to lead to any violation of air quality standards. AR HS 2654. Similarly, the Forest Service does not analyze the use of sno-cats during inclement weather because sno-cat use in the past has averaged three times per season, AR HS 2622, and does not evaluate the effects of potential fuel spills because fuel caches and refueling sites are to be located within spill containment liners, at least 300 feet away from surface water, and the permittee must file an emergency and spill prevention plan. AR HS 2673–74. An agency is not required to quantify all possible effects, especially those that will be relatively minor, as long as the agency explains why further quantification is not necessary. *City of Los Angeles v. F.A.A.*, 138 F.3d at 808; 40 C.F.R. § 1502.2(b) ("Impacts shall be discussed in proportion to their significance. There shall be only brief discussion of other than significant issues."). I review the EA to determine whether it contains a "reasonably thorough discussion of probable environmental consequences." *Selkirk*, 336 F.3d at 958 (internal quotations omitted). The Forest Service reasonably concluded that helicopter-skiing and related activities would not affect air or water quality, and explained its reasons for this conclusion. As a result, the Forest Service was not arbitrary and capricious in deciding not to analyze the combined effects of snowmobile use and helicopter-assisted skiing.

3. *Inventoried Roadless Areas and Wilderness*

Plaintiffs contend that the Snowmobile EA is too general in its analysis of the effect of snowmobile use on wilderness areas. The Snowmobile EA provides a table that describes the sizes of the roadless areas, the estimated acres of snowmobile trails and play areas, and the percentages of the roadless areas that are most affected by snowmobiles, ranging from

0.9% to 1.4%. AR SM 1974. The Forest Service acknowledges that snowmobile use has an impact on the opportunity for solitude and modifies the appearance of the natural areas, but notes that these are temporary impacts. *Id.* The Snowmobile EA contains a "reasonably thorough discussion of probable environmental consequences" on roadless areas. *Selkirk,* 336 F.3d at 958.

Plaintiffs argue that the Helicopter EA fails to evaluate past and existing winter recreation activities on wilderness, and that both EAs fail to evaluate the combined impact of both projects on these areas. However, the Helicopter EA identifies the winter recreation activities that most affect wilderness areas—only snowmobiles and helicopters due to the remoteness of these areas—and acknowledges that noise from these uses will affect the solitude and tranquility of wilderness areas. AR HS 2627, 2636. The Helicopter EA also identifies the three roadless areas where helicopter and snowmobile activities may converge—Liberty Bell, Sawtooth, and Pasayten Rim—but only a limited amount of snowmobile use occurs in those areas. AR HS 2627; AR SM 1972. The Forest Service took the requisite "hard look" at the cumulative effects of helicopter and snowmobile uses on wilderness and roadless areas.

### 4. *Non-motorized Recreation*

Plaintiffs claim that the Forest Service neglected to evaluate cumulative effects of past and existing winter recreation use on non-motorized recreation, and the cumulative impact of both decisions. The Snowmobile EA acknowledges that the cumulative effect of "any of the alternatives and the other reasonably foreseeable future actions (including increasing use) and *current activities,* coupled with management direction from the amended Forest Plan, would be very limited opportunities for non-motorized recreation that completely

avoids motorized activities, and is near plowed Forest roads." (emphasis added). AR SM 1981. Similarly, contrary to plaintiffs' contentions, the Helicopter EA catalogs the existing uses and impacts, including snowmobiling, backcountry skiing, Nordic skiing, and snowshoeing, on areas in which these activities take place. It concludes that the cumulative effects of winter recreation activities on non-motorized use is a more limited opportunity for recreation that avoids motorized activities. AR HS 2634. The Forest Service adequately considered cumulative impacts from both existing and future winter recreation activities on nonmotorized uses in the Snowmobile and Helicopter EAs.

### 5. *Noxious Weeds and Soils*

Plaintiffs contend that the Snowmobile EA does not adequately analyze preexisting activities in evaluating cumulative effects of the proposed use on the spread of noxious weeds. The Snowmobile EA accounts for the spread of noxious weeds by existing uses when it describes snowparks as areas with high potential for the establishment and spread of weeds, creating the need to implement an active, ongoing noxious weed management program. AR SM 1981. The Snowmobile EA concludes that the cumulative effect of existing and anticipated increases in winter recreation activities mean a wider spread of noxious weeds, and the Forest Service proposes to continue its aggressive weed management strategies to minimize the significance of the effects. AR SM 1982. The Snowmobile EA contains a sufficient analysis of probable environmental consequences.

As for the Helicopter EA, the Forest Service states that the spread of noxious weeds and impacts to soil due to helicopter and sno-cat use held a relatively minor risk, particularly since the activities will not involve ground-disturbing activities and because sno-cat use has occurred in the past an average of three times per

season. AR HS 2654. Therefore, the Forest Service does not evaluate the cumulative impact of helicopter and snowmobile uses on noxious weeds or soils. Plaintiffs challenge this conclusion, especially with respect to sno-cat use and possible fuel cache spills. The Forest Service did not act in an arbitrary and capricious manner in deciding not to more fully evaluate the project for impacts of noxious weeds and soils. 40 C.F.R. § 1502.2(b) (review impacts in proportion to their significance). The Forest Service is required to evaluate only "probable environmental effects." *Selkirk*, 336 F.3d at 958. The Forest Service did not act arbitrarily or capriciously.

### 6. *Wildlife*

Plaintiffs contend that both EAs fail to analyze the combined impact of both projects on the grizzly bear, the northern spotted owl, lynx and mule deer. The Helicopter EA evaluates the cumulative impacts of snowmobiling, including hill-climbing activities in grizzly bear denning habitat, and helicopter activity, finding that such activities could result in disturbance to denned or recently emerged grizzly bears, but states that much of the grizzly bear habitat receives no snowmobile or helicopter activity. AR HS 2644, 2645; AR SM 2013, 2015. The FWS agreed that the activities were not likely to adversely affect grizzly bear. AR HS 2241, 2301; AR SM 1391, 1469. In addition, the Helicopter EA contains mitigating measures to minimize potential disturbance to grizzly bear, such as a prohibition on skiing and helicopter activity within one kilometer of grizzly bear den sites discovered in the future, and any new runs, drop off or pick up points must first be approved by a wildlife biologist. AR HS 2617.

Similarly, both EAs disclose and discuss cumulative effects on the northern spotted owl, agreeing that the activities have the potential to disturb nesting habitat but

that these impacts are not significant. AR HS 2647–48; SM 2017. The FWS agreed with the Forest Service that these activities would not likely adversely affect northern spotted owl. AR HS 2243, 2301; AR SM 1393, 1470. There are no groomed snowmobile routes within 1/4 mile of any known nest trees, and mitigation measures in the Helicopter EA prohibit helicopter flights within one mile horizontal distance from known nesting stands or at least 500 feet above them after April 1st. AR SM 2017; AR HS 2647.

Both EAs raise concerns regarding the compaction of snow that may allow predators to more easily access lynx. AR SM 2019; AR HS 2648. Although helicopter-assisted ski runs do not contribute to compacted snow trails, both the Helicopter and the Snowmobile EAs contain an exhaustive list of snowmobile routes that run through lynx habitat, or Lynx Analysis Units ("LAU"). AR SM 2022; AR HS 2650. All except one of the LAUs that have heli-skiing activity have low snowmobile route densities. AR SM 2022; AR HS 2651. In addition, both EAs recognize that the cumulative impact of winter recreation activities on lynx is limited due to the temporal separation between lynx and winter recreation activities because lynx are primarily nocturnal. AR SM 2019; AR HS 2648. The FWS agreed with the Forest Service that these activities would not likely affect lynx. AR HS 2243, 2301. The Forest Service adequately evaluated the impacts of snowmobile and helicopter activities on grizzly bear, northern spotted owl, and lynx in the Snowmobile and Helicopter EAs.

Finally, in a somewhat different argument, plaintiffs contend that the Snowmobile EA does not "adequately account for the impact of existing use" on mule deer. The Forest Service does not respond to this argument. It appears that plaintiffs admit that the Forest Service adequately

evaluates the impacts of existing winter recreational use on mule deer—it has been shown to disturb them—but that the Forest Service was arbitrary and capricious in failing to find that these effects were not significant enough to warrant an EIS. The Forest Service was not arbitrary and capricious in relying on the fact that because eighty-four percent of mule deer range would be unaffected by existing and proposed uses, the effects on mule deer are not significant enough to warrant an EIS. AR SM 2009.

## CONCLUSION

Plaintiffs' motion for summary judgment (# 37) is denied. The motions for summary judgment of defendant (# 42) and defendant-intervenors (# 43) are granted.