WILKINSON, Circuit Judge,
concurring:
Several aspects of the record are troubling in this case: the EPA’s March 2009 comments, the Dingess Run WVSCI score of 33, and the WVDEP’s listing of Dingess Run as an impaired waterway. But, on balance, they are not enough to reverse in light of the standard of review, the unfolding of the agency process, and the analysis in the Corps’ Combined Decision Document. I am thus pleased to concur in the majority opinion. I write separately, however, to underscore two critical points in the analysis.
I.
First, in March of 2009, the EPA stated that it had “significant concern regarding the impact to the-, human environment” from the proposed mining project. J.A. 109. The question then becomes whether a court should seize upon this assessment as a basis for vacating the later grant of the fill permit under the Clean Water Act. If we were to do so under these circumstances, I fear we would stifle the very *130 agency candor and applicant responsiveness that is essential to the proper functioning of the administrative process and, ultimately, to the goal of natural resource protection.
Here, for instance, the EPA’s March 2009 objections to Highland Mining’s initial permit application precipitated an extended dialogue among the Corps, the EPA, and Highland. The product of this discussion was meaningful concessions from Highland and the Corps that were responsive to the EPA’s stated apprehensions. Specifically, Highland and the Corps agreed to a more extensive mitigation plan for the project site, additional testing and monitoring of water quality in and around the site, and a number of best management practices to be employed in operating the mine. See Maj. Op. at 123, 127-28. Following these modifications, the EPA concluded in September 2009 that Highland and the Corps “could move forward with issuance of the permit.” J.A. 144. But for the EPA’s March 2009 comment letter, the foregoing corrective measures might not have been considered.
Even after this litigation commenced, the agency dialogue continued. In April 2011, the Corps determined that the challenged permit merited “further consideration” and filed an unopposed motion for voluntary remand in the district court. The Corps and Highland then engaged in additional communication regarding the project’s potential environmental impact and Highland’s associated mitigation efforts. This exchange led to further evaluation of operating practices at the proposed mine, with the Corps ultimately concluding that “[ijmpacts to the waters of the U.S. associated with the proposal have been minimized to the maximum extent practicable regardless of the designated [post-mine land use].” Status Report, No. 3:11-cv-00149, ECF No. 45, at 7 (S.D.W.Va. Sept. 20, 2011).
There is a limit to the extent that courts can direct the CWA process, given the episodic nature of our involvement, the standard of review, and the lack of our own extensive scientific expertise. We can, however, try to adjust incentives in a manner that facilitates the protection of natural resources in the course of agency deliberation. The administrative process works best when interested parties are comfortable sharing information that can shed light on issues affecting the ultimate outcome. Were we to jump on the EPA’s March 2009 comments, the single low WVSCI score, or the Corps’ earlier request for voluntary remand as a basis for reversing the Corps’ decision, it would discourage honest conversation and meaningful corrective actions in future cases.
Accordingly, rather than utilize judicial review in a manner that encourages regulators or those they regulate to sweep adverse evidence under the rug, our affir-mance here encourages them to keep the dialogue above board and disclose even problematic information so that the appropriate parties can take steps to address any underlying environmental concerns. There will, of course, be cases where substantial evidence fails to support the Corps’ decision to dispense with an environmental impact statement, but I cannot conclude the Corps acted arbitrarily in granting the CWA permit here after prolonged, but productive, deliberation.
H.
When an agency is tasked with determining the environmental impact of a project upon an ecological setting that is already the situs of other activity, there is a real danger that the agency’s appraisal may fail to take a wide enough view of the collective impact of all of the environmen *131 tal effects that the location has experienced over time. Recognizing the risk that an agency may proceed with too myopic a focus on the singular effects of the particular project before it, NEPA calls for an EIS if a project produces a “cumulatively significant impact” in tandem with other activity. 40 C.F.R. § 1508.27(b)(7) (emphasis added). This cumulative impact requirement, however, is not one with which agencies always comply. See Grand Canyon Trust v. FAA, 290 F.3d 339, 342-43 (D.C.Cir.2002) (discussing cases where agencies have failed to consider cumulative impact).
Here, by contrast, the record demonstrates that the Corps gave full consideration not just to the incremental effects of the proposed valley fill, but also to its cumulative effects. See Maj. Op. at 126— 27. The CDD thus included an in-depth discussion regarding the cumulative impacts of the proposed project. The Corps considered the “impacts associated with the [project] when added to other past, present, and reasonably .foreseeable future impacts.” J.A. 246. It ultimately concluded that, in light of the evidence in the record, “it is not expected that the Reylas Surface Mine would, when combined with other mining activities within the Dingess Run Watershed, result in significant cumulative impacts to the human and/or aquatic environment.” J.A. 256. Again, I cannot conclude after careful review of this record that the required cumulative impact assessment was arbitrarily ignored.
III.
The Corps has been tasked with regulating mineral extraction in West Virginia in a way that respects the extraordinary, but fragile, environmental and natural resources of that state. Here, the record demonstrates a frankness in the agency dialogue that resulted in a greater respect for NEPA’s basic aims. Given the corrective measures ultimately taken, I believe it would be counterproductive to leap upon the earlier EPA and Corps reservations as a reason to reverse. To do so would produce darkness in the process, not light. Of course, the judiciary is not a rubber stamp on agency action, and there are times when contrary evidence will either not support or will actively undercut an agency’s decision. But this is not one of those cases. I therefore concur in the majority’s opinion and in its decision to affirm.